492 F.Supp. 137 (1980)
Robert L. RATCHFORD, Jr., Superintendent of Insurance, State of Ohio and Liquidator of Manchester Insurance & Indemnity Company, Plaintiff,
v.
UNITED STATES CENTRAL UNDERWRITERS AGENCY, INC., et al., Defendants.
No. 77-856C(B).
United States District Court, E. D. Missouri, E. D.
April 30, 1980.
*138 Andrew Rothschild, of Lewis, Rice, Tucker, Allen, Chubb, St. Louis, Mo., for plaintiff.
James F. Gunn, of Gunn & Gunn, Gerald A. Rimmel, Susman, Schermer, Rimmel, & Parker, St. Louis, Mo., for defendants.

MEMORANDUM
REGAN, District Judge.
This court-tried diversity action was brought by Harry V. Jump, the then Superintendent of Insurance of the State of Ohio (Jump) who had been appointed by the Court of Common Pleas of Franklin County, Ohio as conservator (and later liquidator) of Manchester Insurance and Indemnity Company (MI&I). In three counts of the *139 amended complaint judgment is sought against United States Central Underwriters Agency, Inc. (U.S. Central) for sums allegedly due MI&I. In a second amended complaint a fourth count was added joining the individual defendants on the contention that they are liable as guarantors for the amounts owing by U.S. Central.
MI&I, an Ohio corporation with its principal place of business in Missouri, was engaged in the general casualty insurance business in a number of states. U.S. Central served as a general agent for MI&I in Missouri, Kentucky, Indiana, and a portion of Louisiana pursuant to standard agency-company agreements executed for the various states. Under the terms of each of these agreements U.S. Central was authorized, inter alia, to bind and execute insurance contracts on behalf of MI&I and to collect premiums and retain commissions out of said premiums at the agreed rate. U.S. Central was obligated to refund commissions on policy cancellations or reductions and to pay the MI&I, within 75 days of the account month, the balance shown to be due on the monthly accounting statements prepared by MI&I and sent to U.S. Central.
Paragraph IIa of each agency agreement provided, in part:
"The Agent [U.S. Central] agrees that all premiums collected under the policies of the Company [MI&I] belong to the Company and shall be held chargeable to him as a fiduciary trust . . ."
In Paragraph IIe, each agreement provided:
"The Agent is authorized to advance premiums on behalf of policyholders, in which event the Agent accepts full responsibility for such premiums."
Count I of the amended complaint involves the sum of $815,167.12, the amount claimed to be due for the period immediately prior to September 23, 1975, the date of Jump's original appointment as conservator of MI&I. This figure represents the balance owing on the July and August, 1975 monthly statements (after deducting all unearned premiums resulting from cancellation of policies), together with an additional sum for the first 22 days of September, 1975 computed from MI&I's files in the same manner as that in which the prior monthly statements were prepared.
We find that U.S. Central owes said amount to MI&I. The premiums were either financed by it, or collected by U.S. Central's sub-agents. In either case, U.S. Central is liable therefor. Under the long-continued and consistent course of dealing between the parties, U.S. Central recognized its obligation to collect from its sub-agents and remit premiums on all policies placed through it. And if credit was extended to a sub-agent or to a policyholder or if the premium was otherwise financed, such fact did not affect the liability of U.S. Central to pay over the amount of the premium, whether or not it was ultimately collected. The evidence also shows that the policies in question would have been cancelled had not the premium been paid. Although Ralph B. Hutchings, Chairman of the Board of MI&I (who is the owner of some 50% of the stock of U.S. Central), testified that none of these premiums had been collected by U.S. Central from its sub-agents, there are no records of U.S. Central substantiating this testimony.[1] We do not credit this testimony of Ralph B. Hutchings. It is also clear from the evidence (and we find) that most of the policies issued through Central were financed. The evidence shows that Manchester Premium Budget Corporation, which financed many MI&I policies placed through U.S. Central, has filed a proof of claim in the amount of approximately $900,000 in the Ohio liquidation proceedings for unearned premiums. In addition, individual policyholders have filed other claims approximating $500,000. In our judgment, plaintiff is entitled to judgment on Count I for $815,167.12, subject *140 to our determination of the validity of U.S. Central's affirmative defenses and setoffs (ruled infra adversely to said defendant).
Count II seeks recovery of the amount of unearned commissions for the period from September 13, 1975 through May, 1976, relating to cancelled policies originally placed by U.S. Central or its sub-agents. As the result of the cancellations, MI&I became liable to the policyholders to return the unearned premiums, and in turn, U.S. Central became liable to MI&I for the amount of the unearned commissions on such return premiums with respect to which U.S. Central had been credited. To the extent MI&I has obtained any portion of the unearned commissions from U.S. Central's sub-agents, credit therefor has been given to U.S. Central. We find that the balance of the unearned commissions which were either paid or credited to U.S. Central is the sum of $221,837.90, and that such amount is owing by it to plaintiff.
Count III relates to unearned premiums, less commissions, for the period subsequent to September 23, 1975 on policies of MI&I written through U.S. Central or its sub-agents and which were cancelled. These premiums had been collected by Central or its sub-agents. There is no dispute concerning the fact that the policyholders whose policies were cancelled are entitled to a return of the unearned premiums paid by them to U.S. Central or its sub-agents. And since the insurance contracts were between MI&I and the policyholders, it is undisputed that the legal obligation to remit such unearned premiums to the policyholder is that of MI&I, not U.S. Central. See Manchester Insurance & Indemnity Company v. Manchester Premium Budget Corporation, D.C. Mo. 1979, 469 F.Supp. 126, affirmed 8 Cir. 1980, 612 F.2d 389. We hold that U.S. Central is liable to plaintiff in the sum of $50,533.54, the amount of such unearned premiums, less commissions.
We next consider the issue of setoffs sought by U.S. Central. Relying on the prior course of dealing between it and MI&I, U.S. Central contends that credit should be given to it for the unearned premiums owing to the policyholders. No contention is made that U.S. Central is entitled to such funds as its property. Its position is simply that it should be given paper credit for the moneys owing to the policyholders, in which event U.S. Central would thereafter pay the respective policyholders the amounts to which they are entitled. U.S. Central does not claim that it has, in fact, paid any of the policyholders any of such unearned premiums. Had it done so, it would, of course, have been subrogated to the policyholders' right of recovery in the liquidation proceeding.
The course of conduct relied on by U.S. Central was a mere matter of administrative convenience which imposed additional burdens rather than benefits upon U.S. Central and was for the purpose of facilitating the refund of unearned premiums to the policyholders. This practice contemplated an ongoing relationship with a solvent insurance company continuing to do business. However, by reason of the changed situation, including MI&I's insolvency, not only would no purpose be served by continuing the former practice of permitting U.S. Central to act as agent of MI&I in remitting to the policyholders their unearned premiums (assuming it actually did so) but any policyholder who was so paid in full would receive more than his proportionate share of the assets of MI&I.
We also note that part of the unearned premiums (which had, of course, been collected by U.S. Central) represents unearned commissions, so that giving credit to U.S. Central for the full amount of unearned premiums, without more, would, on U.S. Central's theory, enable it to retain such unearned commissions. So, too, giving credit to U.S. Central would not constitute any defense to claims filed by policyholders in the liquidation proceedings. U.S. Central cannot conceivably be legally damaged by being denied credit for the unearned premiums owing to the policyholders unless it is seeking to obtain a windfall in that amount to which it is not entitled to the extent of any premiums it failed to pay over to the *141 policyholders. Such unjust enrichment should not be countenanced.
U.S. Central further argues that plaintiff is estopped from recovering, asserting that plaintiff prevented it from collecting premiums from its sub-agents. The evidence does not support this contention. Nothing in any restraining order issued by any court barred U.S. Central from collecting any premiums. It is, of course, true that on October 10, 1975, the Insurance Commissioner of Louisiana mistakenly construed the Louisiana injunction restraining MI&I from the further transaction of business in Louisiana as preventing U.S. Central from attempting to collect premiums from its sub-agents, and threatened contempt of court proceedings if U.S. Central continued to do so. Plaintiff is not responsible for this threat. In addition, U.S. Central did not offer any records or credible evidence which would indicate the dollar amount of premiums, if any, which U.S. Central allegedly did not collect by reason of the alleged restraints. And obviously, the sub-agents would still be indebted to U.S. Central for any amounts they may not have remitted to it.
U.S. Central also contends that it sustained substantial damages by reason of the fact that MI&I (not plaintiff) cancelled its agency contracts without giving it the full 180 days notice of cancellation provided in the contracts. The letter of termination antedated plaintiff's appointment as conservator. We also note that even if its agency contracts had not been cancelled, U.S. Central could not have written further MI&I business. We find that U.S. Central was not damaged by reason of the cancellations. In addition, this unliquidated claim is not a proper set-off. If it has any merit, it should have been asserted as a claim in the liquidation proceeding. Cf. Manchester Insurance & Indemnity Co. v. Manchester Premium Budget Corp., supra.
Defendant is not entitled to set off any of the foregoing items or any others asserted by it (as to which there is no substantial evidence), so that plaintiff's claims in the amounts above set forth in Counts I, II and III should be awarded in full.
In Count IV plaintiff seeks recovery against the individual defendants based on their separate "guaranties" executed in June, 1971. At that time, these defendants collectively owned all of the stock of U.S. Central and each was a director of MI&I. Except for defendant John W. McNellis, these defendants also were directors of Manchester Life & Casualty Management Corporation (Management) the parent company of MI&I.
Each "Guaranty" document recited that the directors of Management & MI&I had adopted resolutions requiring any director of either company with any financial interest in any corporate entity producing business for MI&I "be required to execute an unqualified guaranty of any accounts owed by said corporate production entity" to MI&I in direct proportion to said director's financial interest in the production company as a condition for continuing to serve as such director. The then percentage of ownership of the insurance agency by the director is set forth in his guaranty with the provision that the said individual binds himself "to guaranty the payment of the percentage interest set forth above, of any default in any obligations" between U.S. Central and Management and/or MI&I. There is a further provision to the effect that in the event the individual guarantor "discontinues serving as a director" of either Management or MI&I or U.S. Central "he shall continue to be bound by the agreement" until and unless there is a complete satisfaction of all "pending" accounts as between the entities.
It is the position of each individual defendant that his guaranty is void for lack of consideration and that in any event it is not, fairly construed, a continuing guaranty of the debts of U.S. Central.
There is no dispute concerning the fact that at and prior to the time the "guaranties" were executed and for some years thereafter both MI&I and U.S. Central were in sound condition and that as between MI&I and U.S. Central no guaranties *142 were either contemplated or deemed necessary. The evidence is clear that the guaranties had their genesis in a suggestion of a New York brokerage firm to Management's general counsel that in view of the then "softness" of the stock market, a contemplated stock offering of Management (the owner of MI&I) might be better received if the accounts owing by the general agents of MI&I were guarantied. U.S. Central then owed MI&I approximately $500,000. The exact nature of the suggested guaranties was not spelled out, so far as shown by the record, probably because the proposed guaranties were considered to be no more than mere "window dressing." As it turned out, although the guaranties in suit were executed in June, 1971, no stock offering was made until a year later. There is no evidence that when the Management stock was ultimately placed on the market, the guaranties were then deemed viable or that their existence was made known to any prospective purchaser of the stock.
The guaranties were drafted by Management's general counsel. There is no evidence that he consulted with the stock broker as to its terms or language. As we have noted, they recited as the basis therefor the adoption of a resolution by the directors of both MI&I and Management requiring each director of either company having any financial interest in any "corporate entity producing business" for MI&I to execute an unqualified guaranty of any accounts "owed" by said corporate entity to MI&I in direct proportion to said director's financial interest in the production company as a "condition" for "continuing" to serve as such director. In fact, no such resolutions had been adopted by the directors of either MI&I or Management. And even had they been adopted we are not advised as to the legal authority of a board of directors to attach any conditions to the right of a director, duly elected by the corporation's stockholders, to "continue" to serve as such. Only the state statutes,[2] the articles of incorporation and by-laws could conceivably confer such authority upon the board of directors of either corporation, and there is no contention that the purported "requirement" for "continued" service was so authorized.
There is no contention that the guaranties were requested by MI&I as a condition for extending credit to U.S. Central or otherwise, nor for that matter, that they were actually accepted by MI&I. Absent a request, acceptance is necessary. Ireland v. Shukert, 1944, 238 Mo.App. 78, 177 S.W.2d 10. Of importance also is the further fact that when new agency-company agreements were executed many months after the guaranties were signed, no requirement of any guaranty of U.S. Central's accounts nor any reference thereto was incorporated in the agency contracts. All four of the individual defendants had been directors of MI&I for many years.
And although U.S. Central was not the only "corporate entity" producing business for MI&I (some of the owners of which were also directors of MI&I), no guaranties of the accounts of those other general agents were executed. Hence, if the intention was to require guaranties from all such directors, the failure to obtain them vitiated the instant agreements. In our judgment, the guaranties are without consideration and not binding upon the individual defendants. Consideration is an indispensable requisite to the validity of a guaranty contract. In the instant case, it cannot reasonably be held that MI&I extended credit to U.S. Central in reliance on the guaranties. The consideration recited in the documents is the right of the guarantor to "continue" to serve as a director, a right derived from the shareholders who never surrendered the power vested in them to select and keep in office the directors of their choice. Absent action by the shareholders mandating the contrary, the individual defendants could continue to serve as director whether or not the guaranties were executed.
Miner v. Bennett, Mo.App. 1977, 556 S.W.2d 692, relied on by plaintiff, is clearly distinguishable. In that case, the guaranty *143 of both existing and future accounts was requested by the creditor (the bank which made the loans), thus obviating the necessity of an acceptance, and credit was thereafter extended in reliance on the guaranty. Hence, the benefit to the debtor was a sufficient consideration for the guaranty contract. Here, the debtor (U.S. Central) derived no benefit from the guaranties. No credit was extended on the faith thereof.
Wholly aside from the foregoing, we do not believe the guaranties were of a continuing nature. Their draftsman was experienced in preparing continuing guaranties with language obligating the guarantor with respect to future obligations of the debtor. No such language was used in the instant guaranties. Even the language of the purported directors' resolutions is inconsistent with a continuing guaranty. Thus, it is recited that the requirement of a guaranty "of any accounts owed" be a condition for "continuing" to serve as a director. The word "continuing" could only have reference to the term the individual was then serving as director, and not to a qualification for election by the stockholders to a future term. Even in the body of the agreement, it speaks of "discontinuing" serving as a director.
And we note that in the purported resolution the word "owed" is used in the past tense in relation to the accounts of the corporate production entity. So, too, in the body of the agreement the language "all pending accounts" reasonably refers to the accounts owed as of the time of the execution of the guaranty which were still unpaid as of the time the guarantor "discontinued" serving as a director. That is, the guaranty would (if valid) continue to be binding as to such unpaid accounts even after the guarantor discontinued serving his then existing term as director. The law is well settled that the obligations of a guarantor are construed strictissimi juris and will not extend beyond what he is fairly bound to by the precise terms of his contract. Pelligreen v. Century Furniture & Appliance Co., Mo. App. 1975, 524 S.W.2d 168, 1972.
All accounts of U.S. Central pending as of June, 1971, have long since been paid. The then term of office of the directors has long since expired. They are not "continuing" to hold that office, having been subsequently elected by the stockholders to other terms. And the debts for which plaintiff seek to hold them liable were incurred under a new agency contract which did not mandate any guaranty.
It follows from all of the foregoing that plaintiff is not entitled to recover against the individual defendants.
The foregoing MEMORANDUM constitutes our findings of fact and conclusions of law. Judgment will be entered in accordance herewith.
NOTES
[1] U.S. Central claims to have destroyed its records of transactions with its sub-agents. The agency contract provides that MI&I shall have access to the agent's books and records for the purpose of determining any fact relating to money due the company on business placed by the agent.
[2] Management is a Missouri corporation and MI&I is an Ohio corporation.